1    UNITED STATES DISTRICT COURT

2    WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3    _____

4                              )
     UNITED STATES OF AMERICA,  ) CR20-215-RSM
5                              )
                    Plaintiff,  ) SEATTLE, WASHINGTON
6                              )
     v.                        ) October 8, 2021
7                              )
     SAMANTHA FRANCES BROOKS,   ) 9:00 a.m.
8                              )
                    Defendant.  ) Sentencing Hearing
9
10   _____

              VERBATIM REPORT OF PROCEEDINGS
11      BEFORE THE HONORABLE RICARDO S. MARTINEZ
              UNITED STATES DISTRICT JUDGE
12   _____

13

14   APPEARANCES:

15

16

17     For the Plaintiff:     Philip Kopcyzinski
                              Assistant United States Attorney
18                            700 Stewart Street
                              Suite 5220
19                            Seattle, WA 98101

20

       For the Defendant:     Michele Shaw
21                            Law Offices of Michele Shaw
                              2125 Western Avenue
22                            Suite 330
                              Seattle, WA 98121

23

24

25

1    THE CLERK:  This is the matter of the United States

2    versus Brooks, case No. CR20-215 assigned to this court.

3    Counsel, will you please make your appearances for the

4    record.

5    MR. KOPCZYNSKI:  Good morning, Your Honor.  Philip

6    Kopczynski for the United States.

7    THE COURT:  Counsel.

8    MS. SHAW:  Good morning, Your Honor, Michele Shaw

9    present with Sam Brooks -- I'm sorry, Samantha Brooks, seated

10   to my left, out of custody.  And there are also family

11   members and friends present on behalf of Ms. Brooks.

12   THE COURT:  Thank you, Ms. Shaw.

13   Counsel, a word of COVID protocol.  We have decided as a

14   district that we'd like everyone to remain masked in the

15   courtroom, unless you're speaking, in which case if you are

16   fully vaccinated and you feel comfortable, you may lower your

17   mask when you speak.  There's no requirement that you go to

18   the podium, if you do not want to.  You are just as welcome

19   to stay at counsel table and speak into the microphone.  Let

20   me remind you that if you choose to leave your mask on when

21   you're speaking, please do your best to slow down a little

22   bit, speak as distinctly as you can.  That will help out our

23   court reporter.

24   We are here for sentencing on a single count.  Let me

25   indicate for you and for our record exactly what the court

1  has received and had a full and complete opportunity to

2  review prior to our hearing this morning.

3      The court has reviewed the plea agreement of the parties,

4  the government's sentencing memorandum, the defendant's

5  sentencing memorandum, with all of the exhibits and the

6  letters of support.  The court has reviewed the presentence

7  investigation report prepared by U.S. Probation Officer Sara

8  Moore.  Ms. Moore is also present with us in the courtroom

9  this morning.

10     And, finally, the court has had a chance to review the

11  release status report in this case submitted by U.S.

12  Probation Officer Daniel Acker.  Trusting the parties have

13  had that same opportunity as the court to fully review all of

14  these materials, Mr. Kopczynski, if I could have the

15  government's recommendation, first of all.

16         MR. KOPCZYNSKI:  Yes, Your Honor.  The government is

17  recommending a year and a day of custody and three years of

18  supervised release.

19         THE COURT:  Anything else you'd like to say in terms

20  of the rationale for the government's recommendation?

21         MR. KOPCZYNSKI:  Sure.  And if I may, I'll go to the

22  podium.

23         THE COURT:  You may.

24         MR. KOPCZYNSKI:  So, thank you, Your Honor.

25     The court, of course, is well familiar with this case.

1   The court has just mentioned the written material that I

2   understand Your Honor has reviewed.  Of course, also we now

3   have in the record the trial of the co-defendant in this

4   case.  And from that overall record, to the government's way

5   of thinking, there are two overriding factors in this case

6   that deserve the court's attention at today's sentencing.

7   And those are the seriousness of this offense and the need

8   for general deterrence.  So I'll take those in that order.

9       The seriousness of the offense.  You know, the court has

10  seen the PSR and heard about this subject at trial, the

11  number of law enforcement personnel that responded when this

12  defendant and the co-defendant were found that night, nearly

13  a year ago, it was three, four, five people that quickly went

14  to the scene.  They had the cameras set up.  There was an

15  officer from BNSF who was watching those cameras.  I think it

16  was a Saturday night, it's near midnight, yet he still is

17  keeping an eye on those cameras.  They are rushed to the

18  scene.  That is reflective of the fact that this is

19  extraordinarily dangerous conduct.

20      We have seen, just in this past year in this country, and

21  in Western Washington, the consequences when things go wrong

22  with these big, massive freight trains.  And we know that

23  night a freight train, carrying dozens of cars of crude oil,

24  was scheduled to come through this exact spot where this

25  defendant placed a shunt on the rails.  So this is just

1    exceptionally dangerous conduct.

2        And I appreciate the defendant, as part of the presentence

3    process, has stated not only full acceptance of

4    responsibility, but perhaps some notion they perhaps didn't

5    appreciate the full gravity of the situation.  And that may

6    be true to a degree, but we must recognize any person who is

7    messing around with the rails for a freight train would

8    appreciate that that is serious business.  Any person who

9    messed around with the signaling system for a traffic light,

10   would know they're doing something that is dangerous.  That

11   is basic common sense.

12       And we think to interfere with a railroad in this fashion,

13   no matter the motivation, is just exceptionally dangerous

14   conduct.  It is fortunate that nothing worse happened than it

15   did, that the shunt was discovered right away.  And the

16   seriousness of the offenses is of great importance today, as

17   the court considers the sentence.

18       Related to all that is what I think is the second point

19   here, Your Honor, and that is the notion of general

20   deterrence.  The court, again, is well familiar with the

21   record here.  There were, last year in Western Washington,

22   dozens of shunting incidents.  Some of this is in the PSR.

23   The notion that at least out in the sort of public domain

24   this idea that this was an act of environmental activism or

25   sympathy with the causes of indigenous people, again, the

1  matter, the motivation, this is just exceptionally dangerous

2  and inappropriate conduct.  And to have dozens of those

3  incidents, makes it only a matter of time before one of them

4  results in a great disaster.

5      And fortunately, those have just completely fallen off a

6  cliff.  After this case, these arrests -- and I am in no way

7  saying that the two defendants here are responsible for those

8  other incidents -- but the fact is, this arrest, this case,

9  this prosecution, it has made a difference.  The shunting

10 incidents have stopped.  And we think the court today, at the

11 conclusion of this important case, can send the message that

12 this behavior is not acceptable.  And we think the

13 appropriate message is a guideline sentence.

14     We recognize the acceptance of responsibility that's

15 terrifically important.  The guidelines account for that.  We

16 recognize this defendant had a lesser role in the offense.

17 The guidelines also account for that.  Once those factors are

18 accounted for, we think the appropriate sentence is at the

19 low end of the guidelines; that's a year and a day.

20     Thank you, Your Honor.

21         THE COURT:  Thank you, counsel.

22 Ms. Shaw?

23         MS. SHAW:  Yes, Your Honor.

24     Your Honor, respectfully, I'm fully vaccinated, so is my

25 client, and my client wishes to address the court this

1  morning, and they would also like to remove their mask when

2  addressing Your Honor.

3        THE COURT:  That's fine.

4        MS. SHAW:  Your Honor, the defense recommendation

5  today is that the court would sentence Sam Brooks -- my

6  apologies -- Samantha Brooks, to 18 months of location

7  monitoring, followed by 36 months of supervised release, and

8  100 hours of community service.  This recommendation is a

9  very slight deviation from the advisory range of

10  imprisonment.  And we're basing this recommendation on the

11  seriousness of the offense, specific and general deterrence,

12  and the history and characteristics of Ms. Brooks.

13       Your Honor, this sentence is indeed a punitive sentence to

14  Ms. Brooks.  It significantly impacts their freedom for a

15  long time.  However, the most important factor to Ms. Brooks

16  at this time is that they keep their job.  It took them ten

17  months to find any type of work, Your Honor.  And that was

18  because, when people would run Ms. Brooks' background, the

19  nature of the charge, and the Internet is full of information

20  about this case, this is the first job that they've had at

21  this time.

22       They have medical insurance and they have health benefits,

23  which allows them to take care of medical issues that they're

24  dealing with, along with the weekly mental health therapy

25  with Doug McClosky, which is a core part of Ms. Brooks'

1    stability at this time.

2        As stated in my memorandum, Ms. Brooks has struggled a lot

3    since their arrest on this.  It's completely turned their

4    life upside down.  They were suspended from college.

5    Fortunately, they were allowed to return and finish the two

6    weeks of undergrad, because they had the support of many

7    professors.  However, on their transcript now, Your Honor, is

8    that mark, it's indelible.  It's there forever.

9        And so Ms. Brooks' dreams of going to graduate school may

10   not ever be met.  But they're going to try, they are

11   determined.  They are prepared to take an online course, or

12   do whatever it might take.  But they know that it will take

13   extra time now.

14       The proposed sentence is one that absolutely does

15   recognize the seriousness of the offense.  Ms. Brooks

16   understands very clearly, Your Honor, that punishment is a

17   part of this process.  And Ms. Brooks is not suggesting at

18   all that punishment is not appropriate in this case.

19       I would ask the court respectfully to consider other forms

20   of punishment besides a simple custodial sentence, because as

21   the court knows, these cases affect every facet of our

22   client's life.  There's been a tremendous amount of press on

23   this case, and many reporters, regretfully, continue to refer

24   to Ms. Brooks as a terrorist.  This is an enduring

25   punishment.  It's a punishment that will last, perhaps, for a

1    lifetime.  In many respects, I don't know how to say it

2    respectfully, but Ms. Brooks has been branded a terrorist.

3    And I would ask the court to consider that.

4        We've talked about the education significance, the job

5    loss, the health benefits loss, but also, Your Honor, in

6    terms of history and characteristics, I think it's important

7    to recognize that Ms. Brooks lost their support community in

8    Bellingham, which was a huge issue to them, given their

9    teenage years growing up that were full of vitriol,

10   harassment, and the threat of violence on a very frequent

11   basis, due to Ms. Brooks' sexual identity.  Ms. Brooks'

12   spirit, relationships, and mental health, suffered a great

13   deal during that time.

14       With respect to specific deterrence, a custodial sentence

15   is absolutely not necessary.  Ms. Brooks has left -- led, I

16   apologize, excuse me, an exemplary life outside of this

17   incident.  And there's no factors to suggest that Ms. Brooks

18   is a risk to the community for future criminal offense

19   behavior.

20       Regarding general deterrence, I want to let the court know

21   -- I don't believe that it's in any of our pleadings, that

22   the government is fully aware, I believe, and I don't think I

23   heard anything different today, that Ms. Brooks has

24   absolutely no connection to any prior shunting incidents.

25   They have never associated themselves with the anarchist

1    group.  Ms. Brooks is not an anarchist.  They've never chosen

2    to identify themselves with that group of people.

3         Regarding the other -- excuse me, regarding whether or not

4    there have been other shunting incidents related to the group

5    that was, indeed, probably responsible for the 40-plus

6    shunting incidents that the government referred to, for those

7    that were opposing the Coastal GasLink Pipeline Project,

8    those have ceased.  The government stated that this morning.

9         The trial and conviction of Ms. Reiche also received a

10   great deal of press and media attention, and has likely also,

11   Your Honor, served as a deterrent to others who may be

12   thinking of engaging in this behavior.

13        Ms. Brooks is an absolutely incredible human being.

14   They're selfless, they're gifted, intelligent, generous.  And

15   as stated in one of the letters, they're driven by deep

16   principles, with a fierce commitment to protect and elevate

17   the vulnerable.  They've immersed themselves in education.

18   They have an incredible sense of what it means to be a part

19   of a community for a young person their age.

20        At the time this incident occurred, or shortly before,

21   they were serving the community by working serving the

22   homeless population that were camped out in front of the City

23   of Bellingham building there.

24        They were doing this work.  They were winterizing tents.

25   They were taking people to medical appointments.  They were

1  going and sitting with them in the hospital, while they were

2  taking a full college load, and while they were working

3  30 hours a week.  This is demonstrative of who their soul is.

4  This is a very, very good human being, with so much

5  potential.

6      Ms. Brooks must start to rebuild their life.  They have

7  the support of their family.  They have a job right now.

8  They're willing to be on house arrest for 18 months.  The

9  36 months of strict supervision is no problem for Ms. Brooks.

10  They have been absolutely in strict compliance with

11  everything that U.S. Pretrial Services expects.  The

12  100 hours of community service is something Ms. Brooks would

13  love to do.  It's a part of their life.  There are many forms

14  of punishment in this case, and I would respectfully ask the

15  court to consider the different forms of punishment that,

16  again, will be enduring for Ms. Brooks.

17      And while a custodial sentence is also a punishment,

18  defense respectfully requests that the court adopt our

19  recommendation, which is a sentence that is appropriate but

20  not greater than necessary.

21      Your Honor, I also want to state, while it hasn't been a

22  part of any 5K motion or cooperation, that my client did sit

23  down and meet with the government.  My client did meet with

24  an agent.  They didn't have anything to offer, but their

25  spirit of cooperation in this case in wanting to say:  Yes, I

1  did this; yes, I'm sorry, I'm accepting responsibility, in my

2  opinion went far beyond simply pleading guilty.

3      I have spent hundreds of hours with Ms. Brooks.  And I

4  respectfully request that Your Honor consider the history and

5  characteristics of Ms. Brooks.  What they've accomplished in

6  their lifetime, what they have to give, and the significant

7  loss it would be at this time in their life, to lose this

8  job, to lose health benefits, and to lose the weekly

9  counseling.

10     Thank you, Your Honor.

11         THE COURT:  Thank you, Ms. Shaw.

12         MS. SHAW:  May my client address the court?

13         THE COURT:  She may.

14     Good morning.  There's no requirement this morning that

15  you say anything, at all.  However, you absolutely have the

16  right to address the court, before the court decides what the

17  appropriate punishment should be in this case.  But I have --

18  I know you've got something prepared, and I read all the

19  letters of support that were submitted on your behalf.

20  Ms. Shaw is an excellent attorney, I've known her basically

21  her entire career.  She's advocating as well as she possibly

22  can for you.

23     But in your comments this morning, I want you to tell me

24  what in the world would you say to other young, perhaps

25  naive, would-be protestors, that think that they've got to go

1    to this extent to protest what may be a very worthwhile goal.

2    The press is going to report this.  Everybody is going to

3    read about it.  The fact that there have been no other

4    shunting incidents since this arrest means everybody is kind

5    of waiting to see, are you going to prison?  How long are you

6    going to prison for?  What do you want to say?

7            THE DEFENDANT:  I would say -- may I take off my

8    mask, Your Honor?

9            THE COURT:  You may.

10           THE DEFENDANT:  I think that anyone, regardless of

11   your political affiliations, should think more critically

12   about the consequences of your actions when participating in

13   activism.

14           MS. SHAW:  Excuse me, I can't hear.  Can Your Honor

15   hear?

16           THE COURT:  Go ahead, pull that microphone a little

17   bit closer to you.

18           THE DEFENDANT:  Sorry.

19           THE COURT:  I know you're nervous, but go ahead.

20           THE DEFENDANT:  Thank you.  I would say my primary

21   concern for anyone who is watching this case and thinking of

22   consequences, is to think more critically than I would say I

23   did, about the intention that you put into how you interact

24   with your community and the impact of your actions on the

25   people around you, as well as the long-term consequences of

1    how you show up for political movements, regardless of your

2    affiliations.

3        One of the things that I've taken away from this case is,

4    regardless of how burnt out, or what my understanding of the

5    situation was, is that I didn't conduct myself with my best

6    judgment, and I wouldn't have put myself in this position

7    intentionally in any way.  And that the consequences of my

8    actions have been far greater than just myself, but also my

9    community, and the ways in which I was able to help the

10   people around me.  And that participating in a political

11   action in any form has long-term consequences for not just

12   yourself, but also for the people around you and who care

13   about you.

14            THE COURT:  What else would you like to say?

15            THE DEFENDANT:  I have a statement prepared, if

16   that's all right with Your Honor.

17       I want to first apologize for my role in the incident on

18   November 28th.  I understand that there's no excuse for my

19   behavior.  And I would also like to express that I would

20   never knowingly cause harm to my community.  My comprehension

21   of the situation was severely lacking at the time, and I

22   didn't understand the extent of what I was doing, or the

23   possible consequences of my actions.  Knowing that that's not

24   an excuse, I do now understand and am deeply sorry for both

25   the potential harm, as well as the impacts that my behavior

1    had.

2        A year ago, I was in the final quarter of my bachelor's

3    degree, and working a job that I dreamed of since the first

4    quarter of that degree.  I dedicated my career and free time

5    for being a better resource for my community.  And throwing

6    that away is not something I would do lightly.

7        In the next year, I hope to get back to where I was then,

8    working on my education, and my health, and being a

9    productive and stable community member.  This time, with a

10   better perspective on the intention that I put into my

11   interactions with the community, and thinking more critically

12   in the ways that I've used poor judgment.

13       I want to also express that causing death or injury to

14   anyone in my community is not something that aligns with my

15   values, and it's not something that I ever planned to do.

16   Through all this, I also understand that my apology is just

17   words, and I would really hope to, in the coming year, show

18   through action that with therapy, addressing my health, and

19   building stability and work, that I can continue to become a

20   better community member.

21       Thank you, Your Honor.

22           THE COURT:  Another question for you.

23           THE DEFENDANT:  Yes, sir.

24           THE COURT:  What do you think about the label

25   "terrorist"?

1       THE DEFENDANT:  I mean, I understand why it was

2  initially used.  But I disagree with it.  And I have been

3  personally hurt by it.  I don't know that it's ever not going

4  to come up next to my name on a Google search.  And I don't

5  know that -- I don't know, I'm pretty young, I don't know

6  what the long-term consequences of it are going to be.  But

7  I'm not a fan.  I don't quite know how to articulate my

8  feelings around it.  It's complicated.

9     I disagree with how I've been labeled, but I understand

10  where it came from.  I'm not sure if it answers your

11  question.

12       THE COURT:  Would your answer be different if that

13  train that was coming right after that shunt was placed had

14  derailed and spilled thousands of gallons of crude oil into

15  that residential neighborhood?

16       THE DEFENDANT:  My answer about my feelings around

17  the word "terrorist"?

18       THE COURT:  Correct.  Would it be applicable to you

19  then, at that point in time?

20       THE DEFENDANT:  I think I would still understand

21  where it was coming from.  But I didn't go into this with

22  larger political intentions, or even intentions to derail a

23  train.  And I understand that that's not an excuse for my

24  behavior and it doesn't justify the way that I have conducted

25  myself leading up to this.  But I would still feel that I'm

1   not politically aligned as a terrorist.  But I would still be

2   understanding of why I'm labeled that way.

3            THE COURT:  Did you read about the fact that on

4   September 25th, just a few days ago, an Amtrak train derailed

5   in Montana, I believe killing three people and injuring

6   scores more?

7            THE DEFENDANT:  Yes, sir.  Yes, Your Honor.

8            THE COURT:  One final question for you.

9            THE DEFENDANT:  Yes, Your Honor.

10           THE COURT:  Because the press I'm sure is going to

11   report this, because the government is asking me to send you

12   to prison for a lengthy period of time in order to deter

13   others --

14           THE DEFENDANT:  Um-hum.

15           THE COURT:  -- I, for one, don't have any fear that

16   you will commit another crime like this again, but my job is

17   also to protect the community.  The last question I have for

18   you is:  Even giving credence to the potential goal, issues

19   with climate change, issues with materials like this being

20   transported over the railway lines, it's a very real

21   questions.  A lot of young, intelligent individuals may feel

22   very strongly.  How best should they attack or address this

23   issue and not put other people in danger?

24           THE DEFENDANT:  Um, I would say respectfully, Your

25   Honor, I don't really have a comprehensive answer for that.

1   But I would say in terms of what makes a difference, I've

2   always found that on larger issues, like climate change, that

3   are largely very much out of the hands of, I feel, most

4   individuals, figuring out ways to contribute to your

5   community, and figuring out ways to impact your immediate

6   circle, is the most productive way to continue to make the

7   world a better place.

8       Because I don't think that there is anything that a single

9   individual can do that would radically change climate change.

10  But you can make an impact on the people around you.  And you

11  can make your immediate environment better, and that is

12  something you could have a direct impact on.  And focusing on

13  that is what I've found to be the most productive and

14  fulfilling.

15         THE COURT:  Thank you.

16      Counsel, let me take a moment to check with our probation

17  officer, Ms. Moore.

18      Good morning.  Thank you for your very thorough

19  presentence investigation report, and your recommendation as

20  well.  Having heard from everyone this morning, is there

21  anything else you would like to say for our record?

22         THE PROBATION OFFICER:  Good morning, Your Honor.  I

23  would just like to say that this was a difficult case for our

24  office.  I staffed it with members of my presentence team.

25  Just given the various factors, you know, I am impressed by

1  Sam's background, her acceptance of responsibility in this

2  case.  And we are sympathetic to all the collateral

3  consequences of their actions.  But in the end, we felt that

4  a term, a small custodial sentence of six months is warranted

5  to provide punishment for an offense that had considerable

6  consequences.

7          THE COURT:  Thank you.

8      Counsel, there's no disagreement amongst the parties

9  regarding the calculation of the guideline range the court is

10  supposed to utilize here.  The total offense level for

11  Samantha Brooks falls at 13.  No countable criminal history,

12  therefore Category 1.  That works out to an advisory range of

13  12 to 18 months in prison.  There are no mandatory minimums

14  in this particular case the court has to consider.  Of

15  course, the statutory provision is up to 20 years in prison.

16  Sam Brooks, the reason why this offense carries a potential

17  penalty of 20 years in prison is -- hopefully the lesson you

18  have learned since this occurred to you, that could have been

19  a terrible disaster that could have occurred there.  I am

20  very familiar with that particular area, personally, because

21  I grew up in Whatcom County.  I was just there for lunch back

22  in July, that very same area, that little park not very far

23  away from there, Marine View Drive.

24      While the court can certainly understand a potential

25  reason behind why someone may want to protest toxic materials

1    or even crude oil being transported along these rail lines,

2    the potential of what could have occurred is staggering.

3    Let's assume that no one got seriously hurt or injured, but

4    just let's assume that a small derailment occurred.  Do you

5    have any idea how much money it would cost to clean up a

6    toxic oil spill in a residential area, how much damage would

7    have been done in terms of dollars?

8         Counsel, the court has taken all the factors that impact

9    sentencing into account, and will impose the following

10   sentence:  In this particular case, as indicated, the court

11   will place Samantha Brooks on three years of supervised

12   release.  During that period of three years, they are to

13   follow all of the conditions that are standard, as well as

14   the four -- or three, sorry, three special conditions, with

15   one small change, that have been recommended by probation.

16   Those three are as follows:  Let me summarize them for

17   purposes of our record this morning.

18        No. 1, the defendant will participate, as directed, in a

19   mental health program, as approved by the United States

20   Probation office.  To the extent they're able to contribute

21   towards the cost of those programs, and the defendant is

22   financially able to do so, that will be determined by

23   probation.

24        No. 2, the defendant will submit to property, person,

25   residences, storage units, computers, data-storage devices,

1  any media, to searches conducted by a U.S. Probation Officer

2  at a reasonable time and in a reasonable manner, based upon

3  reasonable suspicion of contraband, or evidence of a

4  violation of a condition of supervision.

5      The defendant is to warn any other occupants of any

6  premises occupied that they may be subject to searches,

7  pursuant to this condition.

8      No. 3, the defendant shall complete 200 hours of community

9  service, as directed and approved by U.S. Probation, to be

10  completed within the first two full years of being on

11  supervised release.

12     The court understands the guideline provisions for a fine

13  call for a fine of $5,500 to $55,000.  However, the court

14  finds that this defendant does not have the current financial

15  ability to pay that fine.  That will be waived by the court.

16  Restitution, thankfully, is not an issue in this case, it's

17  not applicable.  By statute, by law, the court may not waive

18  the penalty and special assessment.  One hundred dollars for

19  every felony count.  There was only one count here, therefore

20  that is set at $100.

21     That only leaves the amount of potential custodial time to

22  impose.  The court is going to impose in this case six months

23  of custody, credit for any time served, to be followed by

24  four months of home confinement, electronic monitoring.

25  They've done really well on supervised release pending

1  sentencing.  The recommendation by probation is to allow them

2  to self-report.  The court will follow that recommendation.

3              MS. SHAW:  Your Honor, does the court know if

4  Ms. Brooks would fulfill the terms of that sentence at FDC

5  Sea-Tac?

6              THE COURT:  Yes, there would be no objection.

7              MS. SHAW:  Thank you, Your Honor.

8              THE COURT:  Mr. Kopczynski, do you have the proposed

9  judgment form?

10              MR. KOPCZYNSKI:  No, Your Honor.  I'm sorry, I did

11  not bring that.

12              THE PROBATION OFFICER:  I have one, Your Honor.

13              MR. KOPCZYNSKI:  Or at least I didn't bring a printed

14  copy.  I apologize.

15     I apologize, Your Honor.  This is my ignorance coming from

16  a different district, and I wasn't aware of the procedure

17  here.

18              THE PROBATION OFFICER:  Did Your Honor intend for the

19  home detention component of location monitoring?  So that's

20  kind of the second most restrictive.  They would be confined

21  to their residence, except for medical, doctor, legal?

22              THE COURT:  Yes.

23              MS. SHAW:  Your Honor, my client, when they serve the

24  four months of electronic home monitoring, do they have

25  permission to work?

1    THE COURT:  Absolutely.  That would be part of it,

2  you know, and health visits, and other things like that.

3  Obviously everything going through probation.

4    MS. SHAW:  Yes, Your Honor.  Thank you.

5    Your Honor, I've reviewed the proposed judgment and

6  sentence.  It comports with Your Honor's oral ruling.

7    THE COURT:  Thank you, Ms. Shaw.  You may approach.

8    Counsel, two final matters for the record.

9    Number one, as the proposed judgment form accurately

10  reflects the sentence imposed by the court, it's been dated,

11  signed, it may be filed with the clerk.

12    Number two, I would point out, I believe it's paragraph 14

13  of the parties' plea agreement, waives the defendant's right

14  to appeal the sentence, or any aspect of the sentence, so

15  long as the court imposed a custodial sentence within or

16  below the guideline range.  The court went substantially

17  below the guideline range, therefore the terms of that

18  paragraph will apply.

19    And, finally, Samantha Brooks, courts don't sentence

20  people for who they are, but for what they do.  You, from all

21  the letters of support that I received, from the fact that

22  these people are here for you today, says you have a lot of

23  support.  You've also had a lot of challenges and a lot of

24  adversity in your life.  There's no reason why you can't get

25  over this as well, because you have so much more positive to

1    contribute to society.

2        Good luck.  All right?

3            THE DEFENDANT:  Thank you, Your Honor.

4            THE COURT:  We'll be at recess.

5                    (Adjourned.)

6

7                C E R T I F I C A T E

8

9

10        I certify that the foregoing is a correct transcript from

11    the record of proceedings in the above-entitled matter.

12

13

14

15    */s/ Debbie Zurn*

16    DEBBIE ZURN
      COURT REPORTER
17

18

19

20

21

22

23

24

25